No. 22-1789

---

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

---

MRP PROPERTIES CO., LLC, *et al.*,
*Plaintiffs/Appellees*,

v.

UNITED STATES OF AMERICA,
*Defendant/Appellant*.

---

Appeal from the United States District Court for the Eastern District of Michigan
No. 1:17-cv-11174 (Hon. Thomas L. Ludington)

---

**APPELLANT'S OPENING BRIEF**

---

TODD KIM
*Assistant Attorney General*
C. SCOTT SPEAR
BRANDON N. ADKINS
MICHELLE MELTON
*Attorneys*
Of Counsel:                          Environment and Natural Resources Division
                                     U.S. Department of Justice
Michael D. Rowe                      Post Office Box 7415
*Associate General Counsel*          Washington, D.C. 20044
U.S. Department of Defense           (202) 532-3251
                                     michelle.melton@usdoj.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY ....................................................................................... vii

STATEMENT REGARDING ORAL ARGUMENT .......................... viii

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT .....................................................2

ISSUE PRESENTED ...........................................................................2

STATEMENT OF THE CASE .............................................................3

    A.    CERCLA .................................................................................3

    B.    Factual Background...............................................................4

            1.    Disruption and market changes wrought by war .......................4

            2.    U.S. and industry partner to address wartime to disruption .......6

            3.    PAW initiatives .........................................................11

            4.    The Valero refineries ................................................15

            5.    The government's involvement at the Valero refineries did not encompass activities specifically related to pollution. .............20

    C.    Procedural History...............................................................21

SUMMARY OF ARGUMENT .............................................................25

STANDARD OF REVIEW ..................................................................27

ARGUMENT .......................................................................................27

    I.    The district court adopted an incorrect understanding of operator liability...............................................................................27

        A.    *Bestfoods* establishes the correct approach to operator liability. .28

i

B.    The district court erred in adopting its operator standard.........29

    1.    The district court's operator standard is inconsistent with *Bestfoods*..........................................................................29

    2.    The district court's operator standard is inconsistent with post-*Bestfoods* case law applying *Bestfoods*. .................33

    3.    The district court's opinion could vastly expand operator liability. ........................................................................46

    4.    The district court was incorrect that the proper operator standard is akin to arranger liability. .............................46

II.    Under the proper operator standard, Valero was not entitled to summary judgment at any of the twelve sites. ....................................48

CONCLUSION ........................................................................................51

CERTIFICATE OF COMPLIANCE .......................................................1a

CERTIFICATE OF SERVICE .................................................................2a

ADDENDUM:  DESIGNATION OF RELEVANT DOCUMENTS.....................3a

# TABLE OF AUTHORITIES

## Cases

*American Premier Underwriters, Inc. v. General Electric Co.*,
  14 F.4th 560 (6th Cir. 2021) ........................................................ 33, 34, 35, 40, 44

*AMW Materials Testing, Inc. v. Town of Babylon*,
  584 F.3d 436 (2d Cir. 2009) ...................................................................36

*Burlington N. & S.F. Ry. Co. v. United States*,
  556 U.S. 599 (2009) ...........................................................................47

*City of Moses Lake v. United States*,
  458 F.Supp.3d 1198 (E.D. Wash. 2006) .............................................38

*Coeur D'Alene Tribe v. Asarco Inc.*,
  280 F.Supp.2d 1094 (D. Idaho 2003) ...................................................38

*Detroit Police Officers Ass'n v. Young*,
  824 F.2d 512 (6th Cir. 1987) ..............................................................45

*East Bay Mun. Util. Dist. v. U.S. Dep't of Commerce*,
  142 F.3d 479 (D.C. Cir 1998) .............................................................38

*El Paso Nat. Gas Co., LLC v. United States*,
  390 F.Supp.3d 1025 (D. Ariz. 2019) ...................................................37

*Estate of Goldberg v. Goss-Jewett Co., Inc.*,
  2019 WL 4221398 (C.D. Cal. 2019) ...................................................38

*Exxon Mobil Corp. v. United States*,
  108 F.Supp.3d 486 (S.D. Tex. 2015) .............................................. 34, 35, 37, 42

*Exxon Mobil Corp. v. United States*,
  2020 WL 5573048 (S.D. Tex. 2020) ...................................................34

*FMC v. U.S. Dep't of Commerce*,
  29 F.3d 833 (3d Cir. 1994) ............................................................ 22, 24

*Franklin Cty. Convention Facilities Auth. v. American Premier Underwriters, Inc.*,
    240 F.3d 534 (6th Cir. 2001) ..................................................................3

*Harris v. Oil Reclaiming Co.*,
    94 F.Supp.2d 1210 (D. Kan. 2000) .......................................................38

*Ill. State Bd. Elections v. Socialist Workers Party*,
    440 U.S. 173 (1979) ..............................................................................45

*Jammal v. American Family Ins. Co.*,
    914 F.3d 449 (6th Cir. 2019) ................................................................27

*K.C. 1986 Ltd. P'ship v. Reade Mfg.*,
    472 F.3d 1009 (8th Cir. 2007) ..............................................................36

*Lichter v. United States*,
    334 U.S. 742 (1948) ................................................................................7

*Litgo N.J., Inc. v. Martin*,
    2010 WL 2400388 (D.N.J. 2010) ..........................................................38

*Lockheed Martin Corp. v. United States*,
    35 F. Supp. 3d 92 (D.D.C. 2014) ................................................... 37, 42

*Miami-Dade Cty. v. United States*,
    345 F.Supp.2d 1319 (S.D. Fla. 2004)....................................................42

*Nu-West Mining Inc. v. United States*,
    768 F.Supp. 2d 1082 (D. Idaho 2011)....................................................38

*Pennsylvania v. Union Gas Co.*,
    491 U.S. 1 (1989) ....................................................................................3

*PPG Industries, Inc. v. United States*,
    957 F.3d 395 (3d Cir. 2020) ........................................... 35, 36, 41, 42

*Rospatch Jessco Corp. v. Chrysler Corp.*,
    962 F.Supp. 998 (W.D. Mich. 1995)......................................................39

iv

*United States v. Bestfoods*,
   524 U.S. 51 (1998) ...................... 1, 2, 3, 25, 26, 27, 28, 29, 30, 31, 32, 34, 37, 38

*United States v. Iron Mountain Mines, Inc.*,
   987 F.Supp. 1277 (E.D. Cal. 1997) ....................................................39

*United States v. Kayser-Roth Corp.*,
   272 F.3d 89 (1st Cir. 2001) .................................................................36

*United States v. Sterling Centrecorp Inc.*,
   977 F.3d 750 (9th Cir. 2020) ...............................................................36

*United States v. Twp. of Brighton*,
   153 F.3d 307 (6th Cir. 1998) ................................................... 40, 43, 44

*United States v. Twp. of Brighton*,
   282 F.3d 915 (6th Cir. 2002) ...............................................................44

*United States v. Vertac Chem. Corp.*,
   46 F.3d 803 (8th Cir. 1995) .................................................................39

## Statutes

28 U.S.C. § 1292(b) ............................................................ viii, 2, 24, 27

28 U.S.C. § 1331 ......................................................................................2

28 U.S.C. § 2201 ......................................................................................2

42 U.S.C. § 9601 ..................................................................................2, 3

42 U.S.C. § 9601(9) .................................................................................3

42 U.S.C. § 9601(14) ...............................................................................3

42 U.S.C. § 9601(20)(A) ............................................................. 4, 27, 28

42 U.S.C. § 9601(21) ...............................................................................4

42 U.S.C. § 9601(22) ...............................................................................3

42 U.S.C. § 9607(a) ................................................................... 3, 21, 22

42 U.S.C. § 9607(a)(1) ...................................................................46

42 U.S.C. § 9607(a)(1)-(4) ...............................................................4

42 U.S.C. § 9607(a)(2) ............................................................ 27, 46

42 U.S.C. § 9607(a)(3) ...................................................................46

42 U.S.C. § 9613(b) ........................................................................2

## Rules

Fed. R. App. P. 26........................................................................2

Fed. R. Civ. P. 12(b)(6)................................................................21

## Other Authorities

10 Fed. Reg. 12,592 (Oct. 4, 1945).........................................17

# GLOSSARY

| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
|--------|------------------------------------------------------------------------|
| NWLB   | National War Labor Board |
| PAW    | Petroleum Administration for War |
| WPB    | War Production Board |

## STATEMENT REGARDING ORAL ARGUMENT

Appellant United States respectfully requests oral argument.  Given the nature and significance of the "controlling question of law," this Court accepted for interlocutory appeal, 28 U.S.C. § 1292(b), the United States believes oral argument would be appropriate and helpful to the Court in this case.

## INTRODUCTION

Six plaintiffs, all wholly owned subsidiaries or affiliates of Valero Energy Corporation (collectively, Valero), maintain that the government's efforts during World War II to coordinate the demand and supply of crude oil and petroleum products renders the government liable as an "operator" under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) at each of Valero's twelve refinery sites in seven states. The district court held that the government was an operator at each of the twelve sites because it had exercised some measure of control over activities at the refineries that produced pollution.

The sole issue on appeal in this case is whether the district court correctly construed CERCLA's operator standard when it held that an operator is a person who, to any extent, manages, directs, or conducts activities at a facility that produce pollution. The district court's operator standard is inconsistent with *United States v. Bestfoods*, 524 U.S. 51 (1998) (*Bestfoods*) and unprecedented in the liability it assigns the government for its wartime conduct. Had the district court applied the appropriate standard, plaintiffs would not have been entitled to partial summary judgment. Accordingly, the district court's partial summary judgment order should be vacated as to operator liability.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 9613(b) because Valero's claims arise under federal statutes, namely, CERCLA, 42 U.S.C. § 9601 *et seq*., and the Declaratory Judgment Act, 28 U.S.C. § 2201.  *See* ECF 43, PageID.775–78 (operative complaint).

This Court has jurisdiction under 28 U.S.C. § 1292(b).  The district court certified its December 9, 2021 summary judgment order for appeal in an order issued on February 16, 2022.  ECF 106.  The government timely petitioned for permission to appeal on February 25, 2022.  28 U.S.C. § 1292(b); Fed. R. App. P. 26.  This Court granted the government's petition on September 8, 2022.

## ISSUE PRESENTED

CERCLA "operator" liability attaches to a person who manages, directs, or conducts activities at a facility that are "specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."  *Bestfoods*, 524 U.S. at 66–67.  Was the district court's assertion that a person may be liable as an operator if, "to any extent," it manages, directs, or conducts "activities that *produce* pollution" consistent with *Bestfoods*?

## STATEMENT OF THE CASE

### A.   CERCLA

Congress enacted CERCLA, 42 U.S.C. §§ 9601–9675, in 1980 to address the serious environmental and health dangers posed by property contaminated by hazardous substances. *Bestfoods*, 524 U.S. at 55. CERCLA establishes a framework to respond to releases and threatened releases of hazardous substances and requires those responsible for the contamination to bear the costs of remediation. *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 7 (1989).

CERCLA allows private parties who have voluntarily funded and performed cleanup actions to recover their past and future cleanup costs from other potentially responsible parties. 42 U.S.C. § 9607(a). The party seeking recovery must prove the following: (1) the contaminated site is a "facility," as defined by 42 U.S.C. § 9601(9); (2) a "release" or "threatened release" of a "hazardous substance" has occurred, as those terms are defined by 42 U.S.C. §§ 9601(14) and 9601(22); (3) the cleanup costs are "necessary" and consistent with the Environmental Protection Agency's National Contingency Plan; and (4) the defendant is a covered person within the meaning of the statute. 42 U.S.C. § 9607(a); *see also Franklin Cty. Convention Facilities Auth. v. American Premier Underwriters, Inc.*, 240 F.3d 534, 541 (6th Cir. 2001). Covered persons include the facility's current and former owners, current and former operators, persons who arrange for the disposal of a

3

hazardous substance (arrangers), and persons who transport hazardous waste for disposal (transporters). 42 U.S.C. § 9607(a)(1)-(4). The United States, like private individuals and entities, is a "person" under CERCLA, and may be liable as a potentially responsible party. 42 U.S.C. § 9601(20)(A) & (21).

## B. Factual Background

### 1. Disruption and market changes wrought by war

Government policymakers and industry leaders quickly recognized that winning World War II would require the country to harness its petroleum resources. *See* ECF 75-49, PageID.6437 (Pls. Exh. 99, hereinafter "Brigham Report"). Yet the war severely disrupted the normal functioning of the nation's markets for crude oil and petroleum products.[1] For instance, the war led to unprecedented demand for new products. Before the war, gasoline had been the refining industry's most important product. During wartime, demand for gasoline fell precipitously, while military demand for other petroleum products, such as fuels and lubricants, soared to new heights. ECF 74-1, PageID.4477 (Pls. Exh. 1) (military used over 500 different petroleum products during war). In particular,

---

[1] Petroleum products are derived from crude oil, and include heating oil, lubricants, asphalt, residual fuel oil, kerosene, diesel and gasoline. A single barrel of crude oil may yield between a half dozen to a hundred or more products, with variation depending on the chemical and physical characteristics of the crude oil (viscosity, sulfur content, etc.) and on the refining processes to which the crude is subjected. *See* ECF 75-31, PageID.6373 (Pls. Exh. 81).

4

there was an extraordinary surge of demand for 100-octane gasoline (aviation gas, or "avgas") and synthetic rubber, both of which were developed in the 1930s and had, to that point, been produced in limited quantities. *See* ECF 74-39, PageID.5805–06 (Pls. Exh. 39, hereinafter "Seminar Report"); Brigham Report, PageID.6438–42 ("The octane race"); *see generally* ECF 75-31, PageID.6372–73 (Pls. Exh. 81).

The war also disrupted the movement of crude and product supplies across the U.S., resulting in market imbalances. Before the war, the refineries on the eastern seaboard received crude oil by tanker ship and turned it into products distributed all along the East Coast; any product shortfall was made up by shipments, also by boat, from the Gulf Coast. *See* Brigham Report, PageID.6477; Seminar Report, PageID.5809–10. The outbreak of hostilities, however, meant the tankers that normally plied the East Coast transporting crude and products were necessary on the front lines, and those that could be spared from service in Europe were vulnerable to attack by German U-boats. Brigham Report, PageID.6477. Between December 1941 and May 1942, Germany sunk 55 oil tankers carrying crude or products to the East Coast. *Id.* As a result, East Coast refineries experienced dramatic, unplanned shortages of crude oil, while civilian consumers along the densely-populated East Coast experienced dire shortages of products like home heating oil. *Id.*; ECF 75-31, PageID.6374 (Pls. Exh. 31). These disruptions

5

rippled throughout the country, impacting crude availability, product demand, and refinery operations in the Midwest and Gulf coast. *See* Brigham Report, PageID.6477; Seminar Report, PageID.5822; ECF 74-1, PageID 4484–85.

### 2. U.S. and industry partner to address wartime disruption

Meeting wartime demand for petroleum products to fuel U.S. planes, tanks, and ships fighting the war was a formidable challenge; doing so while also ensuring sufficient availability of products for industrial and civilian consumption was a herculean task. Industry and government agreed that government action was necessary to help ensure that both the military and civilians had adequate access to petroleum products to win the war. *See, e.g.*, Seminar Report, PageID.5776.

The task of managing concerns regarding petroleum products was assigned to the Office of the Petroleum Coordinator, later renamed the Petroleum Administration for War (PAW). *See generally* Seminar Report (general overview of PAW functions); ECF 74-1. PAW's mission was to ensure petroleum products were available, adequately and continuously, in proper forms, at proper places, and at reasonable prices, to meet military and civilian needs. ECF 94-15, PageID.10092 (Pls. Exh. 348).

PAW was aware from the outset that it could not achieve this goal through government fiat, and was disinclined to attempt to manage the petroleum industry by government takeover. *See* Seminar Report, PageID.5785 ("[PAW's leaders]

concluded that they could not meet the war problem without industry's cooperation; that they could not do it by issuing a lot of dictates from Washington; that they had to do it by getting industry to play ball with them."). Instead, PAW relied to an unprecedented extent on industry to ensure the needed products were available, at the right times, and in the right locations.[2] ECF 74-1, PageID.4477. The agency was "dedicated to the proposition that cooperation, rather than coercion, was the formula by which the forces of Government and industry could best be joined in the service of the Nation." *Id.*; *see also* ECF 94-15, PageID.11095–97; Seminar Report, PageID.5785–86 (discussing "Basic Philosophy Underlying Government-Industry Team"); ECF 75-31, PageID.6377–80 (PAW worked in cooperation with industry not by coercion); *cf. Lichter v. United States*, 334 U.S. 742, 776 (1948) (in mobilizing for war, the government

---

[2] PAW also often assisted refineries by serving as an intermediary between the refineries and a variety of civilian and military agencies. Those civilian agencies included the Office of Price Administration, which issued rationing orders and price controls, including for crude oil and petroleum products; the War Production Board (WPB), which established a nationwide priority ranking system to identify scarce goods, prioritize their use, and facilitate their production; the National War Labor Board (NWLB), which mediated industrial disputes and controlled wages, and the Reconstruction Finance Corporation, whose subagencies (e.g., the Defense Supplies Corporation and the Defense Plant Corporation) produced and acquired strategic materials and financed plant construction, expansion, and equipment for the same. PAW also served as an intermediary between refineries and the military branches, which consumed petroleum products and had procurement contracts with individual refineries.

chose to "retain[] the maximum of individual freedom consistent with a general mobilization of effort").

PAW often relied on industry to make recommendations that it would then implement. For instance, the industry committees determined how much crude oil was privately available, which refineries had capacity to process that crude, what products they could produce given their existing equipment, and how best to allocate product components. PAW used the resulting data, in coordination with industry, to assess how the refining industry could address projected military and civilian demand in the short and medium terms. *See generally* Seminar Report, PageID.5778–85 (explaining division of authority between PAW national and district offices and reliance on industry committees). The industry committees also advised PAW how to address specific problems arising from wartime disruptions, such as particular crude and product shortages. *See, e.g.*, ECF 82-49, PageID.8215 (Defs. Exh. 49) (memorandum describing industry-government cooperation to address fuel oil shortages impacting railroads); ECF 74-23, PageID.5084 (establishing procedure for communications with industry committees).

In 1945, a PAW official offered some illustrative examples of the types of problems PAW addressed, and how it addressed those problems in coordination with industry committees:

> [I]f the Army wants more eighty-octane, all-purpose gasoline,
> the Program people and the Refining people in Washington may

8

decide that the best source for that gasoline is in District Two, which is the [M]idwest district.  The Refining Director will get in touch with the District Director, and he in turn will get in touch with the District Refining Committee and say, 'We have to have some more eighty-octane out of your district.  Who is going to make it?'

They then sit down and try to figure out who is going to make it.  We do not try to set ourselves up as knowing all the intricacies of the refineries in the districts.  We go to the [industry] committees.  Those are the ones who know . . . So we toss them the problem.

Again, there may be a shortfall of gasoline in the District of Columbia, as we experienced a while ago.  We must find a way to move more supplies in.  Some companies may have a little bit more and some companies not so much.  How are we going to meet that problem?  We do not ask for weekly or daily reports from every company on every tank.  We go to the companies and say, 'We have to move some gasoline into the district.  How are we going to meet this problem?'  These industry fellows have to work that out. . . .

The PAW is not concerned with all the specific and detailed actions required to solve a problem, so long as results are achieved and there is no issue as to equitable treatment of all interested parties . . . [I]f the proposal [from industry] promises to get the results and seems fair and equitable, we say 'O.K.  Go ahead.  Do it that way.'

Seminar Report, PageID.5786–89; *see also id.* 5804.

Another example demonstrates the extent to which the government relied on industry partners to both flag concerns and recommend fixes.  In the winter of 1942-43, PAW was informed by the refining industry of an imminent shortage of residual fuel oil used to power railroad locomotives.  *See, e.g.*, ECF 82-49, PageID.8215.  After meetings attended by both the railroad and refining industries, PAW sent a telegram to all Midwest refiners west of the Mississippi and many Southwest refiners asking them to address these shortages by increasing production seven percent above prior production levels, based on industry calculations of the

shortfall.  *Id.*; *see also* ECF 76-6, PageID.6653 (Pls. Exh. 106) (January 1943 request that Midwest refineries increase fuel oil yields).  PAW then learned from the committees that there were also residual fuel oil shortages east of the Mississippi, and sent another telegram to those refiners, also requesting an increase in production.  ECF 82-49, PageID.8216.  In response to PAW's telegrammed requests, PAW noted that many refineries were willing to comply if PAW would raise fuel oil prices.  PAW reproduced some replies:  "Typical of this type of refusal of the request are the following:  'Will be glad to comply providing of course fuel oil prices are raised to compensate.'"  *Id.* 8217.  PAW convened a committee made up of six industry members, representing different types of refineries, to advise on the impact of these changes and assess how refineries might comply economically.  After intensive study by the industry committee, PAW concluded it needed to improve the economics of producing residual fuel oil, and accordingly recommended a price increase to the Office of Price Control.  *Id.* 8217–19.

PAW's commitment to cooperation arose from its recognition that the government could not achieve its goals without industry's help, but also from a more fundamental commitment to free market values.  The agency intended to leave undisturbed, as far as possible, the petroleum industry's existing structure and markets, in order to allow refineries to emerge from the war in the same

10

competitive position they had been in beforehand.  *See, e.g.*, ECF 75-31,
PageID.6383 ("[PAW officials] announced at the outset their determination to keep
the industry intact, with its external and internal competitive vigor unimpaired . . .
[so that it may resume] unimpaired when the war is over."); Seminar Report,
PageID.5786 ("[PAW] agree[d] that there would be as little government regulation
as was necessary . . . We [PAW] are not trying to reform the industry.  We are not
trying to change its competitive habits.  We are not trying to do a bit of that.").

### 3.  PAW initiatives

PAW did not produce or own oil and was not a procurement agency.
Instead, it made recommendations or issued directives to address wartime needs
based on the advice of national and local industry committees that had been formed
to advise the agency.  PAW assisted the refining industry in meeting wartime
challenges in various ways, depending on the particular challenge.

One persistent wartime challenge was to meet the military's demand for
large volumes of avgas.  PAW engaged in multiple efforts to facilitate avgas
production.  For instance, at PAW's request, refineries shared technical
information and know-how about avgas production amongst themselves.  ECF 94-
15, PageId.11187–88 (quoting Recommendation No. 23).  PAW also sought to
increase production of avgas by helping interested refineries voluntarily convert
and/or expand their facilities.  *See* Brigham Report, PageID.6555.  For instance, in

1941, PAW interceded with the Office of Production Management (a predecessor to the WPB) to help obtain priority approval for 47 different refinery expansion projects, all of which PAW deemed necessary to increase avgas production.  *Id.* 6555.  PAW also helped refineries producing avgas source various avgas components from other refineries.  ECF 94-15, PageID.11145.

Another wartime challenge was the crude shortages experienced on the East Coast and, later in the war, the Midwest.  PAW responded by taking action to address the issue both long- and short-term.  To help alleviate East Coast crude shortages caused by the unavailability of tanker ships, PAW helped facilitate movement to the East Coast by rail, ECF 94-15, PageID 11158–60, while simultaneously creating a longer-term solution by helping organize the construction and financing of an intercontinental crude oil pipeline.  *See* Seminar Report, PageID.5810.

PAW also helped resolve crude and product shortages by requesting certain classes of refineries voluntarily produce more or less of particular products.  These non-binding requests were typically issued by letter or telegram.  Sometimes, the requests were sent to all refineries of a certain class or size in the country; in other instances, they were sent to all or nearly all refineries in a specific region.  They

were rarely, if ever, sent exclusively to one refinery.[3]  For instance, in November 1942, PAW telegrammed all Midwestern refineries and requested that each refinery limit its crude usage to no more than 95 percent of its crude usage in the prior quarter.  This would leave additional crude available to refineries on the East Coast that were then running at 75 percent capacity.  Brigham Report, PageID.6477.  PAW was careful to specify that the request did not apply to production of avgas or other critical war products.  *Id.*

In 1942 and 1943, as crude shortages in the Midwest grew acute, PAW approved several programs to alleviate crude supply issues.  *See generally* ECF 74-44, PageID.5867 (Pls. Exh. 44).  These programs included a pooling program to facilitate the sharing of scarce crude oil among Midwest refineries, a rationing program to equitably share crude among refineries (with preference given to refineries making critical war products, such as avgas components), and a voluntary subsidization program to compensate refineries for the extraordinary costs of transporting crude oil from the Gulf Coast to the crude-starved Midwest

---

[3] PAW occasionally issued such requests via formal directives.  The letters/telegrams were distinct from formal directives and orders issued by PAW. As one government official explained, the telegrams imposed no legal obligation on the recipient, but were, rather, "jaw boning."  ECF 75-49, PageID.6477 n.138. Even the formal directives, however, were not intended to mandate compliance but rather to protect industry against antitrust claims.  *See, e.g.*, ECF 94-15, PageID.11088, 11116; Brigham Report, PageID.6457–60, 6465.

(compensated crude program).  Brigham Report, PageID.6474–80; *see also* ECF 74-44, PageID.5867–76.

At other times during the war, there might be a particular need for a specific petroleum product and PAW would request production of that product from the refineries capable of producing it.  For instance, in August 1943, PAW requested Midwest refineries maximize yields of gasoline, kerosene, range oil, and other fuels so long as doing so would not restrict the production of maximum quantities of avgas or other critical war products.  *See* ECF 74-49, PageID.5941 (Pls. Exh. 49); ECF 74-50, PageID.5943 (Pls. Exh. 50).

Another persistent wartime concern was sabotage.  PAW's Facility Security Division conducted periodic inspections to assess whether a facility was vulnerable to sabotage, espionage, aerial bombardment, or other dangers (such as negligence) that would threaten continuity of operations.  *See generally* Brigham Report, PageID.6436, 6559–62; ECF 77-47, PageID.7149–7158 (Pls. Exh. 149); ECF 82-44, PageID.8190.  After inspections, PAW usually sent letters to refinery management with recommendations for improvements, as necessary.  *See, e.g.*, ECF 85-41, PageID.9285 (Defs. Exh. 191) (noting multiple refineries received zero recommendations).  Recommendations *were* recommendations, not directives. *See, e.g.*, ECF 83-6, PageID.8268 (Defs. Exh. 56) (columns for promised versus actual compliance).

### 4.  The Valero refineries

The twelve refinery sites at issue in this suit are located in Illinois, Kansas, Tennessee, Michigan, Oklahoma, Texas, and California.  The refineries were constructed between 1901 and 1941 and owned and operated by various private companies.  *See* Brigham Report, PageID.6472–6577.  These companies were in various financial and market positions pre-war.  Some refinery companies were sophisticated, heavily capitalized, and fully integrated (that is, had operations across the full continuum of the oil supply chain from production through refining).  Other refineries were owned by relatively small, independent companies (that is, conducted only refining operations and sourced crude on the market).  One refinery in this suit went through bankruptcy in 1941 and was cut off by its oil supplier before coming out of receivership in 1943.  *Id.* 6507–09.

Each refinery differed in terms of equipment installed and products made, and due to the differences of configuration and geography, faced different wartime exigencies.  Each refinery was also subject to different requests, regulations, and directives on the part of PAW and other government agencies.  Each refinery made different decisions about participation in wartime programs.

For instance, Gulf Oil's refinery in Port Arthur, Texas, was then the world's largest refinery, with a capacity to process 110,000 barrels per day of crude, and produced more than 600 products.  Brigham Report, PageID.6553–54.  Before the

war, the Port Arthur refinery produced avgas, was planning to expand to produce larger volumes of avgas, and was selling its avgas to the Navy. Over the course of the war, Gulf Oil took the opportunity to expand its facilities, and dramatically expanded avgas production at the Port Arthur refinery, obtaining nearly 200 military procurement contracts worth close to $200 million. *Id.* 6565. PAW assisted Gulf with the bureaucratic process of obtaining priority ratings necessary to undertake the expansions desired by the company, but the company financed these expansions with private capital. Gulf received both direct and indirect subsidies for producing avgas. For instance, Gulf sought and received certificates of necessity from the government that allowed it to accelerate depreciation on at least $20 million worth of refinery equipment. *Id.* 6555–59. In May 1944, PAW also asked Gulf if it could increase avgas production, and offered to reimburse the company for any unusual costs of doing so. *Id.* 6564–65. PAW ultimately reimbursed Gulf for $3 million incurred for these increases in production at the Port Arthur refinery.[4] *Id.*

---

[4] The government's involvement at Gulf's Port Arthur refinery was primarily aimed at increasing avgas production, but extended to other activities as well. First, as at other refineries, PAW conducted security inspections of the facility. Second, as at other refineries, the government requested at various points that refineries on the Gulf Coast, including Port Arthur, ration crude or increase production. *See, e.g.*, ECF 77-34, PageID.7112–13 (Pls. Exh. 184) (requesting district III refineries limit crude inputs); ECF 77-33, PageID.7108 (Pls. Exh. 183) (requesting district III refineries making 80-octane gasoline to maximize production).

16

The Port Arthur refinery, unique among the refineries in this suit, experienced significant labor unrest as the war wound down. In 1945, workers at that facility twice walked off the job; in both instances, the government took proactive steps to address labor unrest so that those strikes would not imperil avgas supplies.[5]

By contrast, other refineries in this suit were small, processed primarily local crude sourced on the market, and did not materially expand during the war. For instance, the Roosevelt refinery, which was owned by a small, independent

---

[5] In May 1945, refinery workers at Port Arthur went on strike, stopping production at the facility and imperiling the military's supply of avgas. *See* ECF 77-49 (Pls. Exh. 199); ECF 77-50, PageID.7205 (Pls. Exh. 200). After government mediators failed to end the strike, the NWLB ordered employees back to work and directed management to accept them. *See* ECF 77-49, PageID.7177. (PAW was prepared to issue a seizure order for the facility, but due to the NWLB order, it was unnecessary. *See* ECF 77-50, PageID.7205–06; ECF 75-49, PageID.6562–63.)

In mid-September 1945, 43,000 refinery workers in twenty states struck over wages. ECF 96-4, PageID.11513 (Def. Exh. 195). In early October, after negotiations between labor and management failed, President Truman issued an executive order directing the Secretary of the Navy to seize 54 enumerated refineries and petroleum transportation companies, including Gulf's Port Arthur refinery. *See* 10 Fed. Reg. 12,592 (Oct. 4, 1945), 1945 WL 28068; ECF 96-4 PageID.11520. On October 5, the Navy informed Gulf it had seized the facility. ECF 94-14, PageID.11060. It appointed the plant's existing management as the facility's operator, instructed management to operate the facility in the normal course of business, and directed strikers back to work. *Id.*; *see also* ECF 96-4, PageID.11522 ("The [oil] industry apparently did not find seizure distasteful."). After the Wage Stabilization Board approved a new wage agreement in March 1946, the refinery was formally returned to Gulf. ECF 93-17, PageID.10672. No other refinery in this case experienced such extreme labor unrest or was subject to government seizure.

company, processed about 4,000 barrels per day before, during, and after the war, did not make critical war products, and did not expand during the war.  *See id.* 6501–02, 6578–95.  During the war, PAW conducted two security inspections of the Roosevelt refinery.  *Id.* 6502–03.  PAW also sent Roosevelt a handful of telegrams and letters.  In May 1942, PAW requested all Midwest refiners, including Roosevelt, reduce gasoline production to 80 percent of 1941 levels; Roosevelt undertook a study of its operations before responding that it was "willing to take quick action" to comply.  *Id.* 6503.  A few months later, in July 1942, PAW solicited a proposal from Roosevelt to produce ethyl benzene—an avgas component—for another refiner from one of Roosevelt's idled units.  *Id.* 6504.  The company responded positively, outlining production amounts and cost. When PAW did not respond, Roosevelt followed up.  *Id.*  PAW then requested a second proposal for more ethylbenzene, which Roosevelt sent along in September. *Id.*  Once again, PAW did not respond and Roosevelt again followed up, stating that, if PAW did not immediately reply, the company would pursue other plans. *Id.*  PAW responded two weeks later and informed Roosevelt that it was not able to make a prompt decision, and that the refinery should therefore move forward with its own plans.  *Id.*  In 1944, PAW inquired whether Roosevelt could increase its production of diesel fuel for the Navy.  Although Roosevelt responded

affirmatively, it also asked for, and received, PAW assistance getting a price increase. *Id.* 6504–05.

The different business choices made by these and other refineries is a reflection of the fact that each refinery was operated on a day-to-day basis by private companies whose management made strategic decisions about how to respond to market conditions.

This is also evident in the refineries' responses to PAW's production requests. Regardless of whether styled as a request or a directive, the twelve refineries responded to PAW's production requests differently. In many instances, refineries eagerly complied with production requests to aid the war effort. *See, e.g.*, *id.* 6503; ECF 82-49, PageID.8217; ECF 74-44, PageID.5877 ("The various war demands placed upon the refineries in the [Midwest] . . . were usually fulfilled on a voluntary basis by offerings from individual plants upon the request of [PAW]."); *cf.* ECF 94-15, PageID.11141 ("[E]verybody was consumed with the desire to win the war. [PAW] didn't have to use clubs."). In some cases, however, refineries sought and obtained hardship exemptions or requested increased prices, or refused to comply. *See, e.g.*, Brigham Report, PageID.6518, 6525, 6551 (exceptions sought and granted); ECF 76-6, PageID.6652 (no compliance). In still other instances, PAW's production requests had no effect because the refinery was

19

already operating at the production yield PAW requested. ECF 84-22,

PageID.8656 (Def's Exh. 122) (no effect on operations).

### 5. The government's involvement at the Valero refineries did not encompass activities specifically related to pollution.

Consistent with the government's roles as allocator of scarce materials, a

consumer of the refineries' products, and coordinator supporting the refineries'

ability to produce necessary products, the government left day-to-day management

of the refineries to their owners. The United States did not manage, direct or

conduct activities at any of the twelve refineries concerning the leakage, handling

or disposal of hazardous waste, or environmental compliance. To the contrary,

each refinery's management made decisions about how to address leakage and how

to manage and dispose of waste.

Valero's expert testified that refinery wastes were generally disposed of on-

site at the refineries, and such disposal practices and methods were unchanged by

the war. *See* ECF 74-31, PageID.5312–13, 5318–19 (Pls. Exh. 31); *see generally*

ECF 74-38 (Pls. Exh. 38) (depositions concerning waste disposal features at

refineries). Valero's expert also testified that leaks and spills were regular

occurrences at these twelve refineries, and that these leaks and spills were of the

same general character before, during, and immediately after the war. *See* ECF 74-

31, PageID.5314 (Pls. Exh. 31). When questioned about corrosion concerns at the

refineries, Valero's expert testified, "every refinery has concerns about corrosion

all the time"; those concerns were present before, during, and after WWII, and "even today." *Id.* 5316. But it was refinery management, not the government, that addressed corrosion and leakage at each site. *See*, *e.g.*, ECF 74-36, PageID.5574–75 (Pls. Exh. 36) (noting that any Midwest refinery purchasing crude with high sulfur content through a PAW program would need to individually decide how to address expected corrosion).

### C. Procedural History

Valero filed suit pursuant to CERCLA and the Declaratory Judgment Act seeking to force the United States to pay a share of Valero's past and future response costs of the environmental cleanup of Valero's twelve petroleum refinery sites in seven states. ECF 4. The government moved to dismiss certain claims pursuant to Federal Rule of Civil Procedure 12(b)(6). The government asserted, *inter alia*, that Valero had failed to state a claim that the government was a former operator of the facilities, and also argued that Valero had failed to allege that it had incurred any costs necessary or consistent with the National Contingency Plan, as required by 42 U.S.C. § 9607(a). ECF 32. In a written opinion, the district court held that Valero had pleaded adequate facts to establish operator liability. *See* ECF 37, PageID.469–79. But, because the court found that Valero had failed to adequately plead that the costs it incurred were necessary and consistent with the

National Contingency Plan, as required by 42 U.S.C. § 9607(a), the court

dismissed the first amended complaint without prejudice.[6] *Id.* 482–87.

Valero subsequently filed its Second Amended Complaint.  ECF 43.  After

the government answered, ECF 44, the court bifurcated the proceeding into phases,

ECF 47.  Following discovery on phase one, both parties moved for partial

summary judgment on issues including whether the United States "operated"

plaintiffs' facilities.  See ECF 68 (Valero motion); ECF 81 (U.S. motion).

Valero's motion urged the court rely on the operator standard articulated by

a pre-*Bestfoods* Third Circuit decision, *FMC v. U.S. Dep't of Commerce*, 29 F.3d

833 (3d Cir. 1994) (en banc) (*FMC*).  In *FMC*, the Third Circuit concluded that an

entity was an operator if it exercised substantial control over the management of a

facility, as established by the presence of four leading indicia of control:  the

products the facility would produce, the level of production, the price of the

product, and to whom the product would be sold.  Valero argued that the

government's wartime conduct met that standard and that control over the facility's

production and control over critical materials like steel necessarily encompassed

control over pollution by impacting both the composition and quantities of

hazardous substances and wastes disposed at the refineries.  ECF 68, PageID.1101.

---

[6] The court's opinion and order also held that Valero's complaint did not
state a claim for arranger liability, *see* ECF 37, PageID.479–81; Valero did not
renew that claim in its second amended complaint.

The government disputed Valero's characterization of PAW's conduct as coercive, *see, e.g.*, ECF 81, PageID.7775, but the government maintained that even so, a national program of refinery coordination could not qualify the government as a CERCLA operator absent specific evidence of government direction, management, or control of activities concerning management of leakage or waste at each site, and Valero had not presented such evidence. *See, e.g.*, *id.* 7738–44.

As relevant here, the district court granted Valero's motion.[7]  ECF 103.  The district court's liability holding rested entirely on its understanding of CERCLA's operator standard.  The district court held that "[a person] will be liable as an 'operator' if, to any extent, it managed, directed, controlled, or conducted any of the facility's activities *that produced* '*pollution*.'"  *Id.* 11569 (emphasis added).

Specifically, the court read *Bestfoods* as establishing that an entity may be liable as a CERCLA operator if it exercises "control over the polluting facilities' operations."  *Id.* 11560.  The district court reasoned that *Bestfoods*' "specifically related to pollution" language should be understood "broadly," *id.* 11567, such that control "having to do with" pollution encompassed control over activities with "any reasonable inference of influence over any of a facility's polluting activities,"

---

[7] The court also granted in part the government's partial summary judgment motion on owner liability, holding that the government was not an owner of the entire Eastern States facility in Houston, Texas.  ECF 103, PageID.11597–11602. Valero has not petitioned this Court to review that part of the certified order.

*id.* 11574; *accord id.* at 11571 ("[The relevant question is,] [b]ased on the totality of the circumstances, did the Government—*to any extent*—manage, direct, control, or conduct any of the facility's activities *that produced pollution*?") (emphasis added).

Having so construed the operator standard, the district court evaluated whether the government's conduct during World War II qualified the government as an operator. *Id.* 11581–97. The court first asserted that there was no genuine dispute that the government "exercised all . . . four [of *FMC*'s] leading indicia of control" at ten of the refineries, three of the four at one refinery, and two of the four at one refinery. *Id.* 11581, 11587, 11593. Considering these leading indicia, as well as other factors indicating control over a facility's operations, the court concluded that the United States was an operator at all twelve facilities. In the court's view, the government's control could not be said to have "nothing 'to do with' the amount of waste [the refineries] produced." *Id.* 11583, 11590, 11597. The court thus granted partial summary judgment to Valero on that issue.

The government asked the court to certify its partial summary judgment order pursuant to 28 U.S.C. § 1292(b). ECF 104. After the district court certified the order for appeal, ECF 106, the government petitioned this Court for permission to appeal. *See In re: USA*, Dkt. No. 1 (6th Cir. No. 22-103). This Court granted the government's petition in a written order. *Id.*, Order, Dkt. No. 5-1.

## SUMMARY OF ARGUMENT

The Supreme Court explained in *Bestfoods* that, given "CERCLA's concern with environmental contamination," an operator is a person who manages, directs, or conducts operations "specifically related to pollution, that is, operations having to do with the leakage and disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods*, 524 U.S. at 66. With the sole exception of this district court, every court that has considered the issue has understood *Bestfoods* to require an entity to have exercised control over decisions concerning pollution, such as decisions regarding whether and how to remediate leakage of hazardous substances and whether, how, and when to dispose of waste containing hazardous substances.

The district court instead defined an operator as a person that "manage[s], direct[s], control[s], or conduct[s] any of [a] facility's activities that *produced* pollution." ECF 103, PageID.11571 (emphasis added). Thus, the court held that control "specifically related to pollution" encompassed any extent of influence over a facility's production of useful products, because such conduct could incidentally influence hazardous waste volumes or compositions.

Neither law nor logic supports the district court's operator standard. First, the district court's opinion is plainly inconsistent with *Bestfoods*, which does not support the district court's inference that activities that *produce* pollution are

activities "having to do with the leakage and disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods*, 524 U.S. at 66–67. A vast weight of authority, including several circuit court opinions, have further confirmed that an operator must have some direct control over pollution, not merely incidental influence over the composition or level of a facility's waste. The district court, however, functionally ignored this authority, relying instead on *FMC* and this Court's *Brighton I* decision, neither of which offer support for its operator standard.

Second, the district court's holding could vastly expand operator liability. The court's theory suggests that CERCLA could reach the government's wartime conduct at each of the roughly 400 refineries in existence during WWII—or perhaps government conduct respecting other critical industries as well. More broadly, the district court's theory could potentially expose to liability innumerable private entities solely on the basis of their influence over a facility's output. Indeed, the district court's misguided theory could render mere consumers of a facility's products operators under CERCLA.

Valero's motion for summary judgment was based on its assertion that the federal government's conduct during World War II influenced waste streams at its twelve facilities. This is not sufficient to render the government an operator under the *Bestfoods* standard, properly construed. To be clear, the government's wartime

conduct is not materially disputed.  The government had a priority allocation system to ration scarce materials during wartime and, throughout the war, requested that refineries curtail production or produce more of certain products.  It was also a significant consumer of petroleum products.  Yet these facts do not establish that the government exercised control specifically related to pollution at any of the twelve facilities.  The Court should vacate the district court's decision as to operator liability and remand for application of the proper operator standard with respect to each refinery site.

## STANDARD OF REVIEW

On an appeal pursuant to 28 U.S.C. § 1292(b), this court reviews the district court's conclusions of law de novo.  *Jammal v. American Family Ins. Co.*, 914 F.3d 449, 454 (6th Cir. 2019).

## ARGUMENT

### I.    The district court adopted an incorrect understanding of operator liability.

CERCLA imposes liability on "any person who . . . operated" a facility at which hazardous substances were disposed.  42 U.S.C. § 9607(a)(2); *see id.* § 9601(20)(A).  The Supreme Court has explained that an operator is one who manages, directs, or conducts activities "specifically related to pollution." *Bestfoods*, 524 U.S. 66.  Valero neither argued nor established that the United

27

States engaged in such conduct, and accordingly, summary judgment was inappropriate.

### A. *Bestfoods* establishes the correct approach to operator liability.

CERCLA's statutory definition of "operator" as a person who "operates" a facility, *id.* § 9601(20)(A), provides little guidance regarding the level or type of control a person must have exercised to be considered an operator, *Bestfoods*, 524 U.S. at 66.  But the Supreme Court's *Bestfoods* decision provides critical clarification regarding the type and level of control a person must exercise to be considered a CERCLA operator.

*Bestfoods* concerned the circumstances in which a parent corporation could be held directly and vicariously liable under CERCLA as an operator for cleanup at a site owned and operated by its subsidiary.  The opinion explains that a parent corporation may be held directly liable as a CERCLA operator for cleanup at its subsidiary's facility if the corporation exercised control over the facility "specifically related to pollution," in particular, control in the form of "manag[ing], direct[ing], or conduct[ing] operations" concerning "leakage," "disposal of hazardous waste," or "compliance with environmental regulations."  524 U.S. at 64–67.  In applying this standard, the Court held it was possible that the parent was an operator because there was evidence it had exercised such control.  Specifically, the Court found relevant that the parent company's agent "played a conspicuous

part in dealing with toxic risks emanating from the operation of the plant" and

actively participated in and exerted control over various responses to

environmental regulatory inquiries. *Id.* at 72.

### B. The district court erred in adopting its operator standard.

The district court's conclusion that an operator is a person who exercises

control at a facility "specifically related to pollution" merely by influencing the

facilities' pollution-producing activities is inconsistent with both *Bestfoods* itself

and with other relevant authority.

### 1. The district court's operator standard is inconsistent with *Bestfoods*.

The district court was mistaken in understanding *Bestfoods* to provide

support for its position equating production with pollution. It made two critical

interpretive errors. First, the district court asserted that *Bestfoods* held that an

operator is a person who exercises control over any of "the polluting facilit[y's]

operations." ECF 103, PageID.11560. In other words, the district court

erroneously believed that the Supreme Court's operator standard required only

some general control over a facility's operations. Second, in order to reconcile its

mistaken view of the standard with *Bestfoods*' "specifically related to pollution"

language, the district court erroneously interpreted that phrase. The court's

interpretation of the operator standard is inconsistent with *Bestfoods*.

The district court's characterization of the operator standard began with its reliance on several passages of *Bestfoods* that the court took out of context. It quoted two passages of *Bestfoods* for support. The first passage stated that the "critical question" for operator liability is whether, "in degree and detail," a parent's actions are "eccentric under accepted norms of parental oversight." ECF 103, PageID.11560 (quoting *Bestfoods*, 524 U.S. at 72). It then relied on another passage, noting, "the Court underscored that 'Congress intended the verb to operate . . . to contemplate operation as including the exercise of direction over the facility's activities.'" *Id.* 11561 (quoting *Bestfoods*, 524 U.S. at 71).

Neither passage supports the district court's view that the Supreme Court intended to define operator as a person who only has control over a facility's general operations. The district court's error derives from its misunderstanding of the opinion's structure.

As a whole, *Bestfoods* made clear that a parent company may be liable for a subsidiary's activities under both direct and derivative theories. As the Court explained, a parent company could be derivatively liable based on its exercise of control over its subsidiary. 524 U.S. at 62–63. The Court also explained that a parent company could be held *directly* liable if the parent exercised control over the facility in question. *Id.* at 65–67. In elaborating on what constituted direct control, the Court also went to great lengths to correct the error of the lower court,

which had held such direct liability was *only* possible if the parent was in a joint

venture partnership with the subsidiary. The Court explained at length that this

view of direct liability was too crabbed.

The *Bestfoods* passages relied on by the district court were meant to address

why direct liability was not as limited as the appellate court whose decision it was

reviewing had believed. *See* ECF 103, PageID. 11560–61. The appellate court

had explained that a parent could be liable if it was in a joint venture partnership

with the subsidiary, and thus had a legally controlling role over the facility. But

the Supreme Court held direct liability was possible in situations where a parent is

not a joint venture partner but nonetheless exercises control over the facility. In

explaining that direct liability was not limited to joint ventures, as the appellate

ruling on review had wrongly held, the Supreme Court noted that a person could be

liable for conduct that was less controlling than that exercised by a joint venturer.

In this context, the Supreme Court explained that Congress intended "the verb 'to

operate' . . . to contemplate 'operation' as including the exercise of direction over

the facility's activities." *Bestfoods*, 524 U.S. at 71. In this same context, the

Supreme Court also explained that exercising an eccentric degree of control over a

subsidiary's facility could also constitute "operation." *Id.* at 72. In full context,

then, the passages relied on by the district court simply clarify that operation

encompasses more activities than "mere mechanical activation of pumps and

valves" but includes the exercise of direction over the facility's activities, even if the parental control falls short of full joint venture partner status. *Bestfoods*, 524 U.S. at 71. Accordingly, *Bestfoods* does not support the notion that the exercise of some control over a facility's production is *sufficient* to establish operator liability.

Second, the district court also misinterpreted *Bestfoods*' phrase "specifically related to pollution." The district court erroneously believed *Bestfoods* nowhere elaborated on the meaning of that phrase. ECF 103, PageID.11564 ("*Bestfoods* did not elaborate on the meaning of operations 'specifically related to pollution' or operations 'having to do with leakage or disposal of hazardous waste.'"). To the contrary, the Supreme Court provided several examples of what constitutes control "specifically related to pollution." For instance, the Supreme Court explained that an entity may be liable where its agents "played a conspicuous part in dealing with the toxic risks emanating from the operation of the plant" or "became directly involved in environmental and regulatory matters." *Bestfoods*, 524 U.S. at 72. These examples demonstrate that the Court intended for a parent to be liable only if there was evidence that it made decisions or exercised control directly over decisions regarding whether and how to remediate leakage of hazardous substances and whether, how, and when to dispose of waste containing hazardous substances. Yet the district court overlooked them.

The district court's opinion, by conflating production with pollution, is inconsistent with the Supreme Court's conscious determination to "sharpen" CERCLA's definition of operator. *Bestfoods*, 524 U.S. at 66. *Bestfoods* declared that CERCLA requires that an operator must control activities *specifically related to pollution*. By deeming any activity concerning a facility's productive operations to be "specifically related to pollution," the district court drains the word "specifically" of meaning and effectively gives "specifically" its opposite meaning, that is, "generally" related to pollution. The district court instead latched onto the phrase "operations having to do with the leakage or disposal of hazardous waste" as all-encompassing. ECF 103, PageID.11561, 11565. But the "having to do with" clause must be read in light of the phrase "specifically related to pollution" that immediately precedes it.

## 2. The district court's operator standard is inconsistent with post-*Bestfoods* case law applying *Bestfoods*.

The district court's conflation of production with pollution is at odds with case law. In the wake of *Bestfoods*, no court—until this district court—had held that a person's control over a facility's productive activities render that person an operator.

Indeed, this Court recently held that *Bestfoods*' operator standard requires a person to exercise control over decisions specifically related to pollution in the sense of control over decisions to remediate leakage or dispose of waste. *See*

*American Premier Underwriters, Inc. v. General Electric Co.*, 14 F.4th 560 (6th Cir. 2021) (*APU*).  In examining whether an entity was an operator, *APU* relied on, and approvingly cited, four CERCLA operator cases.  *Id.* 576–77.  *APU* noted that, in each of these four cases, CERCLA operator liability was appropriate only when the facts established that the putative operator had control specifically over disposal or leakage of waste.  *Id.*  *APU*'s reasoning demonstrates that this Court understands *Bestfoods* the same way as its sister circuits.  *Id.*; *see also id.* 579–81 ("The facts don't show that GE's onsite warranty-administration activities had anything to do with pollution, hazardous waste, or environmental compliance.").

    *APU*'s reliance on *Exxon Mobil v. United States* is particularly revealing in the present context.  108 F.Supp.3d 486 (S.D. Tex. 2015) (*Exxon*).  As relevant here, Exxon argued the government was an operator of two WWII refineries, based on largely the same evidence put forward by Valero in this case and relying on the same legal arguments.  The *Exxon* court found that the government had exercised considerable influence over the refineries.  *Exxon Mobil Corp. v. United States*, 2020 WL 5573048 at *1 (S.D. Tex. 2020) (apportionment opinion).  But the *Exxon* court nonetheless *twice* held that such control was insufficient to establish that the government was liable as an operator in light of *Bestfoods*.  *Exxon*, 108 F.Supp.3d at 521–23; *Exxon*, 2020 WL 5573048 at *1, *47 (S.D. Tex. 2020) ("[T]he government's involvement in the refineries falls short of that necessary for liability

as an operator.  The record evidence does not cause the court to change its 2015 holding that the government was not an operator of the refineries.").  As the *Exxon* court explained, "[d]irect and specific federal government involvement in the waste-disposal matters at issue is required," 108 F.Supp.3d at 523, and there was no evidence that the government had contracted about waste disposal at the refineries, *id.* at 521–27.  The district court thus rejected the argument that the government's World War II-era conduct made it an operator of two refineries, and this Court's *APU* decision approvingly citing that analysis suggests this Court agrees.  *See APU*, 14 F.4th at 580–81.

The Third Circuit has pointedly rejected the argument that a person's control over production, by changing the volume or composition of waste streams, constitutes control specifically over pollution.  In *PPG Industries, Inc. v. United States* (*PPG*), the Third Circuit considered whether the government was an operator of a chromium ore processing facility by virtue of its wartime conduct respecting the chromium chemicals industry.  957 F.3d 395 (3d Cir. 2020).  The Court held that the government's general, wartime direction over the chromium chemicals industry was not sufficient to render the government an operator of the facility in question.  The Court noted there was no evidence that the government had exercised control specifically related to pollution, and expressly noted that a higher volume of waste associated with increased

production was not itself evidence that a person exercised control specifically

related to pollution:

> PPG's argument boils down to the following: when faced with a
> Government directive to increase output during a time of war,
> [plaintiff] rose to the occasion, and more production meant more
> waste, which makes the government an operator . . . . [T]he
> dispositive question is:  did the Government 'manage, direct, or
> conduct operations specifically related to pollution . . . ?  The record
> clearly answers this question:  the Government urged [the processor]
> and all chromium chemicals manufacturers to increase output, but it
> was [the processor] that managed operations specifically related to
> pollution.  It was entirely [the processor's] decision, not the
> Government's, to continue the longstanding practice of stockpiling the
> majority of waste outside and uncovered, letting it seep into the soil
> and groundwater.

*Id.* at 405.

Likewise, in *United States v. Sterling Centrecorp Inc.*, 977 F.3d 750 (9th

Cir. 2020), the Ninth Circuit held that a government order, issued during WWII

and directing a facility to shut down production, was not the exercise of control

"specifically related to pollution."  *See id.* at 758 ("The *Bestfoods* standard

confirms that operator status has a nexus requirement.  That is, it requires that an

operator's relationship to the facility at issue must, at least in part, focus on

'operations specifically related to pollution.'  Therefore, operator liability requires

something more than general control over an industry or facility.").  *See also AMW*

*Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 443–44 (2d Cir. 2009);

*United States v. Kayser-Roth Corp.*, 272 F.3d 89, 102 (1st Cir. 2001); *cf. K.C. 1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1020 (8th Cir. 2007).

But these courts are not alone in so holding. Numerous district court decisions reflect the same basic approach to operator liability after *Bestfoods*. For instance, in *El Paso Natural Gas Co., LLC v. United States*, plaintiff, the operator of nineteen uranium mines, alleged that extensive U.S. restrictions and control over the uranium market, including directives that influenced the mines' waste streams, rendered it an operator. 390 F.Supp.3d 1025 (D. Ariz. 2019). The court accepted that the government exercised considerable influence on all aspects of the uranium market and industry, for instance by regulating the possession, transport, and delivery of uranium ore; acting at the ore's sole purchaser; and setting the ore-grade cut-off, which necessarily influenced the composition and volume of the mine's waste. *Id.* at 1043. Nonetheless, the court held the government was not operator of the mines because it did not exercise sufficient control over the mines or their pollution-related operations. *Id.* at 1043–45.

Similarly, in *Lockheed Martin Corp. v. United States*, the court recognized the government's "monopsonistic control over the solid propellant industry" but disagreed that the United States was an operator of the relevant sites simply because it influenced waste streams. *See* 35 F. Supp. 3d 92, 99, 149 (D.D.C. 2014), *aff'd*, 833 F.3d 225 (D.C. Cir. 2016) ("[The conclusion that the government

37

determined the facility's output, level of production, price, and seller] is

inconsistent with *Bestfoods*'s requirement that operator liability is concerned first

and foremost with control over 'operations having to do with the leakage or

disposal of hazardous waste.'") (quoting *Bestfoods*, 524 U.S. at 66–67); *see also*

*Exxon*, 108 F.Supp.3d at 522 ("*Bestfoods* clearly requires more than general

influence over the economy or over a plant's operations, *even if the result could*

*increase waste production*.") (emphasis added); *City of Moses Lake v. United*

*States*, 458 F.Supp.3d 1198, 1227 (E.D. Wash. 2006) (rejecting argument that

design and installation of productive equipment was equivalent to managing,

directing, or conducting operations having to do with leakage or waste).[8]

---

[8] Other district courts have also emphasized that, in light of *Bestfoods*, specific control over pollution—not control over a facility's other operations, including productive operations—is required to establish operator liability. *See, e.g.*, *Estate of Goldberg v. Goss-Jewett Co., Inc.*, 2019 WL 4221398 at *3 (C.D. Cal. 2019) ("[I]t is inconsistent with *Bestfoods* to hold [an officer] liable as an operator simply because, as President [of a corporate entity], [the officer] was ultimately in charge of all aspects of the corporation. Instead, [the officer's] direct liability as an operator must stem from 'manag[ing], direct[ing], or conduct[ing] operations specifically related to pollution.'") (quoting *Bestfoods*, 524 U.S. at 66–67); *Litgo N.J., Inc. v. Martin*, 2010 WL 2400388, *24-25 (D.N.J. 2010), *aff'd in part & vacated in part on other grounds sub nom. Litgo N.J., Inc. v. Comm'r N.J. Dep't Envtl. Protection*, 725 F.3d 369 (3d Cir. 2013) (U.S. not an operator where it did not manage, direct, or conduct any activities that had to do with leakage or disposal of hazardous waste); *Coeur D'Alene Tribe v. Asarco Inc.*, 280 F.Supp.2d 1094, 1125–30 (D. Idaho 2003) (*Bestfoods* requires "some nexus between [a] person's or entity's control and the hazardous waste contained in a facility"); *cf. Harris v. Oil Reclaiming Co.*, 94 F.Supp.4th 1210 (D. Kan. 2000) (individual not an "operator" under Oil Pollution Act where he had general management responsibilities but played no role in the company's operations that were related to

Even before *Bestfoods*, the vast majority of courts rejected the proposition that the government's status as a heavily directive wartime manager and interested consumer would render it an operator. *See, e.g.*, *East Bay Mun. Util. Dist. v. U.S. Dep't of Commerce*, 142 F.3d 479 (D.C. Cir 1998) (government's WWII conduct setting prices, regulating labor, financially supporting mine, and entering into output contracts did not render it an operator of zinc mine); *United States v. Vertac Chem. Corp.*, 46 F.3d 803 (8th Cir. 1995) (government's Vietnam-era conduct in requiring chemicals facility give priority to production of agent orange, and produce agent orange to U.S. specifications, did not render it an operator of the facility); *United States v. Iron Mountain Mines, Inc.*, 987 F.Supp. 1277 (E.D. Cal. 1997) (government's WWII conduct setting prices, subsidizing production, regulating labor and wages, and dictating who could purchase outputs did not render it an operator of zinc and copper mine); *Rospatch Jessco Corp. v. Chrysler Corp.*, 962 F.Supp. 998, 1003–06 (W.D. Mich. 1995) (government's Korean War-era conduct aimed at facilitating production of military aircraft engines did not render it an operator of engine manufacturing facility). *Bestfoods* suggests these decisions were correct.

---

pollution). But, when an entity exercises control directly over pollution or waste, it may be liable. *See, e.g.*, *Nu-West Mining Inc. v. United States*, 768 F.Supp. 2d 1082, 1089–91 (D. Idaho 2011) (government liable as an operator because it affirmatively managed the design and location of waste dumps at four mines).

The district court largely failed to grapple with this substantial line of authority contradicting its view of operator liability. The district court did not consider this Court's *APU* decision, which had been decided shortly before the district court issued its own decision. This omission is especially glaring given *APU*'s favorable treatment of the *Exxon* opinion, which the district court here disparaged. *See APU*, 14 F.4th at 581.

Remarkably, the district court also did not engage with—or even acknowledge—*PPG*'s reasoning rejecting the idea that substantial control over a facility could, by itself, create operator liability. Despite the obvious thrust of *PPG*, the district court instead suggested *PPG* was relevant only for the unremarkable proposition that "the Government is as subject to CERCLA as private companies." ECF 103, PageID.1158–59. The district court likewise did not acknowledge that the reasoning of *Sterling Centrecorp* was inconsistent with its operator standard, or address the nearly dozen other circuit and district court opinions discussing U.S. operator liability for the government's control over industries critical to various war efforts. None of these opinions—aside from *FMC*—have held the government liable as an operator solely for exercising control over the *production* of useful products.

Rather than engage with this considerable line of authority, the district court instead relied heavily on two other federal court of appeals decisions: the Third

Circuit's decision in *FMC* and this Court's decision in *United States v. Township of Brighton*, 153 F.3d 307 (6th Cir. 1998) (*Brighton I*). Its reliance on these decisions was misplaced, however.

First, *FMC* was decided before *Bestfoods* and does not and cannot supplant *Bestfoods*' operator standard. To the extent *FMC* holds that an entity's operator status is assessed by looking to whether a person exercises "substantial control" over a facility's general operations by assessing the "leading indicia of control," rather than by assessing a person's control specifically over pollution, that holding is no longer good law in light of *Bestfoods*. Indeed, the Third Circuit has itself limited *FMC*'s holding in light of *Bestfoods*, and in so doing rejected the very same reasoning underlying the district court decision on review here. *See PPG*, 957 F.3d at 403–05. Specifically, the Third Circuit explained:

> *Bestfoods* clarified that operator liability only extends to those who 'manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste or decisions about compliance with environmental regulations.'" *This means that operator liability requires something more than general control over an industry or facility*—it requires some indicia of control over the facility's polluting activities. Thus, the language the Supreme Court used in *Bestfoods* suggests that operator liability requires something more than general wartime control over an industry.

*Id.* (emphasis added). As *PPG* elaborated, it is not enough to simply identify "a Government directive to increase output during a time of war," and assert that

"more production meant more waste." *Id.* at 405. Control must be specifically related to the management of the leakage or disposal of hazardous waste.[9]

Thus, the district court erred in drawing support for its expansive operator standard from *FMC*, as even the Third Circuit has recognized that case is of limited value after *Bestfoods*. *See also Exxon*, 108 F.Supp.3d at 521, 527 (explaining the origin of *FMC*'s operator standard and why *Bestfoods* rejected it); *Lockheed Martin Corp.*, 35 F.Supp.3d at 148 n.77 (questioning *FMC*'s continued relevance after *Bestfoods*); *Miami-Dade Cty. v. United States*, 345 F.Supp.2d 1319, 1342 (S.D. Fla. 2004) ("[T]he Third Circuit's reasoning in *FMC* does not assist this Court, because *FMC* is inconsistent with *Bestfoods*.").

Second, the district court also erred in finding support for its expansive operator standard in *Brighton I*. *See* ECF 103, PageID.11561–63. In the court's view, *Brighton I* embraced *FMC*, and therefore endorsed the notion that "substantial control" over a facility could render a person liable even absent evidence that person had exercised control over activities specifically related to

---

[9] Although disapproving *FMC*'s operator standard, the Third Circuit saw no need to expressly overrule *FMC* because it found *FMC*'s result consistent with *Bestfoods*. As the Third Circuit in *PPG* emphasized, there was sufficient evidence in *FMC* that the government had exercised control over operations specifically related to pollution because the facility's wastes were disposed of in government-owned equipment lent by the government to the facility. *PPG*, 957 F.3d at 406.

42

pollution.  But the fractured *Brighton I* opinions do not endorse this sweeping proposition.

*Brighton I* concerned a town's liability for cleanup of a local dump owned and operated by a private entity.  Beginning in 1960, the town passed a resolution approving the use of the property as a dump and contracted with the dump owner to use the site as a dump for town residents.  153 F.3d at 310.  The contract provided that the dump would be subject to the town's supervision, and the town would pay the dump owner a monthly fee for rent and maintenance.  *Id.*  The minutes of the town's meetings chronicled its involvement with the site for the next 13 years of the dump's operation, including its involvement addressing dump maintenance and other decisions at the site, such as fire protection.  The town also intermittently appropriated money for the dump's repair and maintenance.  *Id.* at 311.  Beginning in the mid-1960s, as it became clear that the dump was struggling with maintenance and to comply with new state regulations, the town's involvement deepened, including assessing the dump's problems and taking affirmative steps to help clean it up.  *Id.*  Under pressure from state regulators who threatened to take legal action to close the dump, the town ultimately helped close the dump.  *Id.*

A divided panel, in three individual opinions, vacated the district court's finding of liability and remanded for further proceedings.  *Id.* at 310.  The basis for

43

the panel's remand decision was murky; its individual opinions did not agree on the operator standard.  This Court recognized the "fragmented nature of the [*Brighton I*] panel" when the same case was appealed a second time, and further explained that *Brighton I* stood for the proposition that *Bestfoods* supplied the "appropriate standard" for determining operator liability.  *United States v. Twp. of Brighton*, 282 F.3d 915, 917 (6th Cir. 2002) (*Brighton II*).

*APU* reaffirmed the limited nature of *Brighton I*'s holding, reading *Brighton I* as establishing only the following propositions: (1) to be deemed an operator, an entity must have exercised *actual* control over operations (rather than merely retained the unexercised authority to control operations); (2) the operator inquiry is a case-specific, fact-intensive one addressing the primary question of whether the entity's activities satisfy the ordinary meaning of the term "operator" under *Bestfoods*' "specifically related to pollution" test; and (3) courts should look to relevant comparator cases and factors considered dispositive in those cases in assessing operator liability.  *See APU*, 14 F.4th at 574–575.

To the extent that *Brighton I* can be read as establishing more than those general propositions, however, it does not control this case.  *Brighton I* did not have occasion to consider whether a finding of substantial control over a facility alone renders a person an operator, or whether, as *Bestfoods* holds, a more specific finding of direction over a facility's leakage, waste, and environmental compliance

44

decisions is necessary.  On the facts of that case, there was simply no dispute that the town was involved in exercising direction and control of operations specifically related to pollution.  The business of the dump *was* the disposal of waste, and the town set the types of waste to be accepted and appropriated funds for maintenance. Moreover, the town was also undisputedly involved, over a period of years, in environmental compliance decisions, including how to respond to state demand letters related to dump clean-up.  When the dump was closed and rehabilitated in 1973, the town paid for the work, which was supervised by the town's engineer.

Accordingly, at most, the *Brighton I* opinions speak to the level of control *over activities specifically related to pollution* necessary to render an entity an operator.  The opinions do not speak to what types of activities constitute those "specifically related to pollution" because there was no dispute that the activities at the dump *were* specifically related to pollution.  The district court therefore erred in reading those opinions as offering support for its erroneous operator standard. *See Detroit Police Officers Ass'n v. Young*, 824 F.2d 512, 517 (6th Cir. 1987) (issues neither litigated nor decided in prior litigation do not bind a future court); *see also Ill. State Bd. Elections v. Socialist Workers Party*, 440 U.S. 173, 183 (1979) (opinion's precedential value extends no further than the precise issues presented and necessarily decided).

### 3.  The district court's opinion could vastly expand operator liability.

The district court's conflation of production with pollution could significantly expand CERCLA liability in a manner inconsistent with the statute's text and purposes.  For instance, the district court's logic could support U.S. liability at every one of the four hundred refineries in operation during WWII.  But its logic also could reasonably be understood to extend liability to *any* person who exercises some measure of influence over production.  Congress did not extend liability to the suppliers of raw materials or the purchasers of end products that generate waste during the manufacturing process.  *See* 42 U.S.C. § 9607(a)(1)–(4).  Yet that seems to be the implication of the district court's opinion.  Nothing in CERCLA, *Bestfoods*, or any other relevant authority supports this result.

### 4.  The district court was incorrect that the proper operator standard is akin to arranger liability.

There is no merit to the district court's assertion that understanding *Bestfoods* as the government has urged, and as numerous other courts understand it, collapses the distinction between "operator" and "arranger" liability.  *See* ECF 103, PageID.11565–66.  Arranger liability is a distinct form of CERCLA liability. *Compare* 42 U.S.C. § 9607(a)(2) *with id.* § 9607(a)(3).  Under the statute, arranger liability requires ownership or legal possession of waste—something not necessary for operator liability.  Moreover, arranger liability attaches regardless of whether the arranger has any relationship to the facility at which the waste is ultimately

46

disposed.  And critically, as the Supreme Court has explained, arranger liability attaches because a person who owns or possesses hazardous substances "takes *intentional* steps to dispose of a hazardous substance."  *See Burlington N. & S.F. Ry. Co. v. United States*, 556 U.S. 599, 611 (2009) (emphasis added).

The district court erroneously believed that interpreting the *Bestfoods* standard narrowly would require courts to apply an intent requirement for operator liability, blurring the distinction between these two forms of liability.  But that is simply not the case.  For instance, a person who is responsible for supervising a facility's pipeline leakage, and is not aware that an underground pipe is leaking, could still be liable as an operator, regardless of the fact that the person did not intend to release a hazardous substance into the environment, or even know about it.  Although it is possible to imagine overlap between the two forms of liability in some factual scenarios, the proper interpretation of the *Bestfoods* decision leaves sufficient room for entities to be operators but not arrangers, and vice versa.

## II.  Under the proper operator standard, Valero was not entitled to summary judgment at any of the twelve sites.

The government's underlying conduct is undisputed.[10]  During World War

II, the government contracted with some refineries to supply petroleum products at

---

[10] The characterization and ultimate legal significance of that conduct, however, is disputed.  While not at issue in this appeal, the government notes to preserve its argument that the evidence does not support the district court's holding that the government's conduct was coercive and all-encompassing.

For example, the court asserted that two California refineries each "resembled a military base," and concluded this supported its operator holding.  ECF 103, PageID.11589.  This fact, even if true, could not support operator liability, as it is not specifically related to pollution.  But beyond that, the district court was simply wrong about the refinery resembling a military base.  The only document the court cited to support its conclusion about the *California* refineries is a document reporting the results of a security inspection conducted at the Port Arthur refinery in *Texas*.  ECF 77-47.  The inspection report states that the Texas refinery employed 126 *private* guards.  ECF 77-47, PageID.7150 (stating guards are company employees), *id.* 7151 (stating there are 126 armed guards at the *Texas* refinery).  The document does not support the court's inference that the Texas refinery had any military or other government presence on site or resembled a military base, and it says nothing about the California refineries.  The court relied on the same inspection report to also conclude that *Midwestern* refineries also had 126 military guards on site.  ECF 103, PageID.11589.  Indeed, the district court cited the same inspection report 31 times to support a variety of conclusions about the pervasive nature of the government's control at various sites, such as that the government had "quality control employees and other representatives on site." *Id.* 11584 n.18 (tenth factor).

The court also relied on evidence that the government seized the Port Arthur refinery as supporting operator liability at *every* refinery, without actually examining the pertinent facts of government involvement—e.g., that the government left refinery management to the plant's existing management—or explaining why seizure at one facility was relevant to its control over other facilities.

Even if this evidence were relevant, the court's mistaken reading of the evidence colored its legal conclusions about the nature and extent of the government's control over the facilities.

negotiated prices; sought to address crude oil and petroleum product shortages by making requests that certain groups of refineries alter production levels, produce certain petroleum products, or share crude oil; set prices of some petroleum products; inspected refineries to assess security; and established a national, trans-industry priority allocation system for critical materials like steel and copper. Yet after *Bestfoods*, as every decision that followed that case has made clear, this conduct is not "specifically related to pollution" and therefore cannot render the government liable as a CERCLA operator.

*Bestfoods* requires there to be some evidence that the government managed, directed, or controlled leakage response or hazardous waste management or disposal at a specific facility, or exercised control related to environmental compliance. Valero did not offer evidence that demonstrates that the government exercised control "specifically related to pollution," as *Bestfoods* requires. Valero has not argued that the government's wartime conduct extended to telling refineries how to handle or dispose of waste, how to manage leakage, or how to comply with environmental regulations—much less that it did so at each individual facility in this suit. Valero did not maintain that the government directed leakage response at any of the twelve facilities in this case. Nor did Valero maintain that the government handled, disposed of, or directed the specific management of hazardous refinery wastes at any of the twelve facilities. Valero also did not

contend that the government exercised control over environmental compliance at any of the twelve refineries. Rather, Valero's legal theory has been that such specific pollution-related conduct is *unnecessary* to establish operator liability, because—in Valero's view—substantial control over a facility's general operations suffices. *See* ECF 68, PageID.1086–1101 (Pls. Mot. SJ); ECF 91 (Pls. Rep. SJ); ECF 99 (Pls. Surrep. SJ). Valero asserted only that, to the extent evidence specifically related to pollution was necessary, the United States' control "necessarily included control over operations having to do with" pollution because it *affected* leakage, waste volumes, and waste compositions. ECF 68, PageID.1101–04. But control over production is not control specifically related to pollution.

The district court appeared to go beyond Valero's motion by asserting that the United States exercised control over pollution and the disposal of waste at the twelve facilities. ECF 103, PageID.11583–84 n.18; 11588–90 n.19; 11594–94 n.20. The district court's footnotes, however, also reflect its legal error equating production and pollution.

For instance, the court asserted that "the Government audited some of the pollution-related costs at [two Midwest refineries]." ECF 103, PageID.11584 n.18. The documents cited for this proposition concern production of and prices for marketable products. The court appears to have mistakenly believed that

50

production costs *are* costs "specifically related to pollution" within the meaning of *Bestfoods*. The court also stated that "the Government participated in decisions related to [the Midwest refineries'] pollution." *Id.* 11584 n.18 (twenty-second factor). The document cited, Valero's expert's deposition, states that the government's decisions impacted the facility's production, which incidentally impacted waste streams at the refineries. In sum, all the court's statements asserting that the government controlled "pollution" reflect this same conflation of production with pollution.

Thus, there was no basis for the district court to grant partial summary judgment to Valero on operator liability. This Court should reverse and remand for further proceedings in light of the appropriate standard.

## CONCLUSION

The district court's conflation of production with pollution is inconsistent with *Bestfoods* and other controlling and persuasive case law concerning CERCLA's operator standard. The government respectfully requests that the Court vacate the district court's grant of partial summary judgment to Valero on the issue of the United States' operator liability and remand for further proceedings.

Respectfully submitted,

/s/ *Michelle Melton*

TODD KIM
*Assistant Attorney General*

Of Counsel:

C. SCOTT SPEAR
BRANDON N. ADKINS
Michael D. Rowe
MICHELLE MELTON
*Associate General Counsel*
*Attorneys*
U.S. Department of Defense
Environment and Natural Resources Division
U.S. Department of Justice

December 5, 2022
90-11-6-21137

## CERTIFICATE OF COMPLIANCE

I hereby certify:

1.      This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Rule 32(f), this document contains 12,240 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Michelle Melton*
MICHELLE MELTON

Counsel for Appellant

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2022, I electronically filed the foregoing using the court's CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Michelle Melton*
MICHELLE MELTON

Counsel for Appellant

# ADDENDUM:  DESIGNATION OF RELEVANT DOCUMENTS

Pursuant to 6 Cir. R. 30(g), Appellant provides the following designation of

relevant documents.

| District Court Docket Number | Description | Page ID # Range |
|---|---|---|
| 4 | First Amended Complaint | 21-85 |
| 13 | Motion to Dismiss Misjoined Plaintiffs and Claims | 101-128 |
| 26 | Order denying Motion to Dismiss for Misjoinder | 262-282 |
| 30 | Transcript of hearing of Motion to Dismiss for Misjoinder | 293-333 |
| 32 | Motion to Dismiss for Failure to State a Claim | 336-369 |
| 37 | Memorandum Opinion and Order granting Motion to Dismiss for Failure to State a Claim | 454-488 |
| 38 | Plaintiffs' Motion for Leave to File a Second Amended Complaint (all attachments) | 489-675 |
| 42 | Order Granting Motion to Amend | 694-697 |
| 43 | Plaintiffs' Second Amended Complaint | 698-780 |
| 44 | Defendants' Answer to Second Amended Complaint with Affirmative Defenses | 781-844 |
| 47 | Order accepting case management proposal in part | 866-868 |
| 68 | Plaintiffs' Motion for Summary Judgment on Certain Elements of Defendant's CERCLA liability  (all attachments) | 1069-1207 |
| 74-1 | Plaintiffs' Exhibit 1 | 4475-4487 |
| 74-23 | Plaintiffs' Exhibit 23 | 5081-5086 |
| 74-31 | Plaintiffs' Exhibit 31 | 5277-5455 |
| 74-36 | Plaintiffs' Exhibit 36 | 5573-5575 |
| 74-38 | Plaintiffs' Exhibit 38 | 5585-5572 |

| 74-39 | Plaintiffs' Exhibit 39, "PAW Seminar Report" | 5773-5844 |
|-------|------------------------------------------------|-----------|
| 74-44 | Plaintiffs' Exhibit 44 | 5857-5892 |
| 74-49 | Plaintiffs' Exhibit 49 | 5940-5941 |
| 74-50 | Plaintiffs' Exhibit 50 | 5942-5944 |
| 75-31 | Plaintiffs' Exhibit 81 | 6368-6385 |
| 75-49 | Plaintiffs' Exhibit 99, "Brigham Report" | 6430-6616 |
| 76-6 | Plaintiffs' Exhibit 106 | 6651-6653 |
| 77-33 | Plaintiffs' Exhibit 183 | 7107-7110 |
| 77-34 | Plaintiffs' Exhibit 184 | 7111-7114 |
| 77-47 | Plaintiffs' Exhibit 149 | 7148-7158 |
| 77-49 | Plaintiffs' Exhibit 199 | 7161-7200 |
| 77-50 | Plaintiffs' Exhibit 200 | 7201-7206 |
| 81 | Defendants' Cross-Motion for Summary Judgment and partial Summary Judgment (all attachments) | 7719-7875 |
| 82-17 | Defendant's Exhibit 17 | 8013-8014 |
| 82-44 | Defendant's Exhibit 44 | 8188-8190 |
| 82-49 | Defendant's Exhibit 49 | 8214-8223 |
| 83-6 | Defendant's Exhibit 56 | 8267-8269 |
| 84-22 | Defendant's Exhibit 122 | 8655-8656 |
| 84-49 | Defendants' Exhibit 149 | 8788-8814 |
| 85-41 | Defendant's Exhibit 191 | 9284-9285 |
| 93-17 | Plaintiffs' Exhibit 300 | 10671-10672 |
| 94-14 | Plaintiffs' Exhibit 347 | 11059-11060 |
| 94-15 | Plaintiffs' Exhibit 348 | 11061-11256 |
| 94-22 | Plaintiffs' Exhibit 355 | 11444-11476 |
| 96-4 | Defendants' Exhibit 195 | 11511-11529 |
| 103 | Court's opinion and order re: Partial Summary Judgment | 11550-11603 |
| 104 | U.S. motion for certification (all attachments) | 11604-11637 |
| 106 | District Court Opinion and Order Certifying Appeal | 11643-11651 |